# Richmond

SARAH A. ANDREWS, ADMINISTRATRIX OF THE ESTATE OF GLEN-
WOOD DEWEY ANDREWS, DECEASED V. APPALACHIAN ELECTRIC
POWER COMPANY, A CORPORATION.

March 12, 1951.

Record No. 3745.

Present, Hudgins, C. J., and Eggleston, Spratley, Buchanan and Miller, JJ.

The opinion states the case.

*Roby K. Sutherland* and *Alton I. Crowell,* for the plaintiff in error.

*Gilmer, Wysor & Gilmer,* for the defendant in error.

EGGLESTON, J., delivered the opinion of the court.

Sarah A. Andrews, administratrix of the estate of Glenwood Dewey Andrews, deceased, hereinafter called the plaintiff, instituted in the court below an action at law against the Appalachian Electric Power Company, hereinafter called the defendant, to recover damages for the alleged wrongful death of decedent who was instantly killed by coming in contact with a highly-charged electric wire which was owned and operated by the defendant, and had broken and fallen into the street in the town of Pulaski, Virginia.

The defendant filed a plea of the general issue and after the evidence had been fully adduced before a jury the lower court, on the motion of the defendant, struck the evidence of the plaintiff on the ground that it failed to show that the defendant was guilty of any negligence which was the proximate cause of decedent's death. A verdict and judgment for the defendant necessarily followed. The lower court failed to pass upon the further asserted defense that the decedent had been guilty of contributory negligence.

The case is before us on a writ of error granted the plaintiff, and the sole assignment of error is that the issues of the negligence of the defendant and the contributory negligence of the decedent should have been submitted to the jury.

The main facts are not in dispute. The defendant company owns, operates and maintains in the town of Pulaski an electric light and power distribution system. A part of the distribution system consists of six copper wires or conductors extending along the south side of and parallel to Commerce street, which runs generally in an east and west direction. These wires or conductors are strung upon and supported by the conventional crossarms attached to wooden poles. The poles are approximately thirty-five to forty feet in height and the crossarms are affixed at a point some three to four feet below the top of the poles. Three of the wires are strung along the northern side of the poles and three along the southern side and are attached to the crossarms by the usual insulators.

The two wires on the ends of the crossarms carry the energy or power used for lighting the town's streets. Each of the wires on either side of the poles, next to the street light wires, carries a current of approximately 2,400 volts. The wire nearest to the poles on the northern side is likewise energized, while that nearest to the poles on the opposite or southern side is not energized.

About seven o'clock p. m., on July 16, 1948, the neutral or unenergized wire, which runs along the southern side of the poles, and the highly-energized middle wire, which runs along the northern side of the poles, broke and fell to the street. The break occurred some eight to twelve feet east of a pole which stands in front of the house of Mrs. Kathleen Kimbrough and near two tall pine trees. Following the break the short ends of the two wires dangled and hung from the crossarm on this pole, but the longer segments fell into the street. The breaking of

the wires was accompanied by a loud noise and flash of light which attracted the attention of persons in the vicinity.

Glenwood Dewey Andrews and his wife lived in a house on the south side of Commerce street, about 300 feet east of the point where the wires had broken. Shortly after the wires fell Andrews walked out of his yard and toward the point where the wires were lying in the street. He was joined by one or two neighbors and they discussed the dangerous character of the fallen wires. In fact, Andrews cautioned one of them not to touch the wires. Just about this time Homer Ryan, an electrician, but not employed by the defendant company, drove up in his car. Seeing the wires in the street and apprehensive that they might injure some passer-by, Ryan caught hold of the energized wire which was covered or protected by light insulation (referred to by the witnesses as "weather-proofing"), and taped or insulated the end of the wire. Having done this, Ryan undertook to pull the wire out of the street and as he did so the insulation or weatherproofing, which he says "was bad or old and rotten," peeled off the wire, thus leaving his hand exposed to the energized metal. He was immediately knocked unconscious and fell to the ground.

Seeing Ryan's peril, Andrews, the decedent, who was standing across the street, remarked to one of his companions, "let's jerk that wire loose from him," and before the companion could reply Andrews dashed across the street, grabbed the wire with both hands, pulled it from Ryan's body, and was almost instantly killed.

When the bystanders were finally able to remove the wire from Andrews' hands and body they noted that the insulation again peeled off the wire.

After having introduced evidence of the ownership and control of the wires and their breaking, the plaintiff, relying upon the doctrine of *res ipsa loquitur,* rested. Agreeing that that principle applied, the court overruled the defendant's motion to strike out the plaintiff's evidence at that stage of the case.

The defendant then introduced evidence tending to show that the break in the wires was not occasioned by its negligence. Expert witnesses on its behalf testified that the transmission lines were constructed, maintained and inspected in accordance with the general custom and usage of similar systems in the industry. Such custom and usage, these witnesses said, did not require in-

sulation or periodical routine inspection of the overhead transmission lines of the system.

Witnesses on behalf of the defendant further testified that the break in the wires was occasioned by a short circuit, due to a small radio antenna wire which had gotten across the transmission lines. The contact of this antenna wire with two of the energized wires caused a short circuit which fused or burned apart one of the energized wires and damaged others. A piece of the antenna wire was found hanging from one of the broken transmission wires near the point of the break. Other pieces, one with a glass insulator attached, were picked up at the point.

How the antenna wire had gotten across the transmission lines and just how long it had been there are not disclosed by the evidence. Witnesses for the defendant testified that the limbs on the pine trees located near the point of the break in the wires had been trimmed in the month of April preceding the accident, and that in connection with this operation they had inspected the wires at that point. They were positive that no foreign wire was at that time across or in contact with the transmission lines.

However, James Alley, a witness on behalf of the plaintiff, testified that he had seen a radio antenna wire with an attached glass insulator, similar to that found at the scene after the accident, dangling from the high-tension wires at or near the point of the break prior to the trimming of the pine trees in the preceding April. Upon cross-examination this witness, a relative of the widow of the decedent, refused to admit or deny that prior to the trial he had made statements inconsistent with his testimony as to when he had seen the antenna wire hanging from the transmission lines.

It is well settled in this jurisdiction and elsewhere that under the doctrine of *res ipsa loquitur* proof that an injury has resulted from contact with a highly-charged wire which is under the exclusive operation and control of the defendant and is out of its proper place, raises a *prima facie* presumption that the defendant was negligent in the performance of its duty and throws upon it the burden of overcoming such presumption. *Appalachian Power Co.* v. *Hale,* 133 Va. 416, 423, 424, 113 S. E. 711; *Norfolk Ry., etc., Co.* v. *Spratley,* 103 Va. 379, 382, 49 S. E. 502; 18 Am. Jur., Electricity, § 110, p. 504 *ff*; 29 C. J. S., Electricity, § 66-b, p. 624 *ff*.

In the recent case of *Virginia Transit Co.* v. *Durham,* 190 Va. 979, 987, 988, 59 S. E. (2d) 58, 62, we said: "When the plaintiff has introduced sufficient evidence to require the application of the doctrine of *res ipsa loquitur,* then to escape liability the defendant must present evidence to prove that the accident was not caused by its negligence. If defendant's evidence is of such a character as to establish conclusively its freedom from negligence, the question of liability is for the court. Otherwise, the question of liability is for the jury under all of the circumstances of the case."

In *Norfolk Ry., etc., Co.* v. *Spratley, supra,* which involved injuries sustained by a pedestrian who came in contact with an energized wire which had fallen into a city street, this court said: "While electric companies are not held to be insurers against accident, still it is due to the citizen that such companies, permitted as they are to use for their own purposes the streets of a city or town, should be held to the exercise of a high degree of care in the construction and maintenance of the dangerous appliances employed by them, to the end that travelers along the highway may not be injured. The danger is great, and care and watchfulness must be commensurate with it." (103 Va., at page 381). See also, *Appalachian Power Co.* v. *Hale, supra* (133 Va., at page 424).

Such high degree of care by those using public streets or highways for the transmission of electric power includes the duty of making reasonable and proper inspection of their wires and appliances. See 18 Am. Jur., Electricity, § 60, p. 454; *Id.,* § 100, p. 496; 29 C. J. S., Electricity, § 47, p. 594. The duty of inspection is not confined to seeing that their wires are in proper condition, but there is a duty also to discover and remove other wires which fall on or overhang their lines. 18 Am. Jur., Electricity, § 100, p. 496.

How often inspection should be made depends upon the circumstances of the particular case and is ordinarily a matter for the jury. 18 Am. Jur., Electricity, § 100, p. 496; *Id.,* § 120, p. 516; 29 C. J. S., Electricity, § 70-b, p. 645.

Where the defect or dangerous condition causing the injury does not arise from the negligence of the power company its liability turns on whether it knew, or by the exercise of reasonable diligence should have known, of the situation in time to have avoided the injury. One who uses such a dangerous agent

as electricity is bound to know the extent of the danger. 29 C. J. S., Electricity, § 47, p. 596; 18 Am. Jur., Electricity, § 100, pp. 496, 497.

It is likewise a question for the jury whether the power company, in the exercise of proper care, should have discovered and remedied the defects or dangers which caused the injury. 29 C. J. S., Electricity, § 70-b, p. 645.

■ Applying these principles to the situation before us, we are of opinion that it was for the jury to say whether the defendant was free of negligence in failing to discover and remove the antenna wire from its transmission lines before the accident occurred.

It is true that expert witnesses on behalf of the defendant company testified that the general usage and custom of the industry did not require periodic inspection of these overhead transmission lines which pass along the street, and that such inspection as was made in connection with the removal of adjacent tree branches was sufficient. The plaintiff offered no testimony to the contrary.

In *Jeffress* v. *Virginia Ry., etc., Co.*, 127 Va. 694, 726, 104 S. E. 393, 403, we said: ''The general usage of the business in a given situation is admissible as evidence of what is reasonable and proper to be done in that situation, from which, along with the other (if there be other) pertinent facts and circumstances of the case, the jury are to determine the question of negligence. If there be no conflict of evidence as to the existence of the general usage, and nothing in the evidence tending to show, as to employees, that the usage was not reasonably safe or adequate for its purpose and occasion, and nothing, as to strangers, tending to show that the usage did not afford as high protection as would result from any other known and practical methods of the business, then the usage itself is conclusive evidence of the exercise of ordinary care, and no verdict to the contrary should be upheld.''

We approved and applied this principle in the recent case of *Virginia Stage Lines* v. *Newcomb*, 187 Va. 677, 682, 683, 47 S. E. (2d) 446, 448.

■ In the case before us, in the absence of evidence to the contrary, evidence of the general usage of the industry was conclusive of the method of inspection which should have been employed.

But that does not necessarily absolve the defendant from negligence. The question is not whether a proper method of inspection was employed, but whether such method as the defendant's witnesses say they employed was employed with reasonable care.

The defendant's witnesses say that they made a thorough inspection of the lines at or near the point of the break when the trees in that vicinity were trimmed in the preceding April, and that no antenna wire was then on or across the transmission lines. But Alley, a witness for the plaintiff, testified that he saw this antenna wire dangling from one of the transmission lines prior to this inspection.

The fact that Alley was related by marriage to the decedent and may have made inconsistent statements with reference to the matter, did not render his testimony incredible as a matter of law and require its rejection, as the trial court seems to have held. These were merely circumstances which went to the credibility of Alley's testimony. It was for the jury and not the court to say whether this testimony should have been accepted or rejected, or what weight should have been accorded to it.

If the jury had accepted Alley's testimony as true and found that the antenna wire had in fact been on one of the transmission lines prior to the date of the inspection, which was about three months before the accident, then the jury would also have had the right to find that the defendant's employees or agents had not made an adequate and proper inspection of the lines at the time they said they did, or that, in the exercise of due care, they should have discovered and removed the trouble before the accident.

In *Norfolk Ry., etc., Co.* v. *Spratley, supra,* this court held that the presumption of negligence under the doctrine of *res ipsa loquitur,* arising from a showing that a pedestrian had come in contact with a charged wire which had fallen into the street, was not overcome by the testimony of a lineman of the company that he had inspected the wire on the morning of the day of the accident and had found it all right, but upon the whole evidence the question of negligence was one for the jury.

In *Stephens* v. *Virginia Elec., etc., Co.,* 184 Va. 94, 34 S. E. (2d) 374, relied upon by the defendant, we held that the clear and uncontradicted evidence adduced by the defendant had overcome or dissipated the presumption of negligence.

The plaintiff argues that the jury would also have been warranted in finding that the defendant company was negligent in failing to have the energized wire which caused the death of the decedent properly insulated, and in not keeping such insulation in good condition.

We find no basis for this contention in the record now before us. The expert witnesses on behalf of the defendant testified that it was not customary in the industry to insulate overhead transmission wires, suspended such as these were, thirty to thirty-five feet above the street level, except by the use of weatherproofing insulation with which the energized wire was covered. Such weatherproofing, they said, is designed merely to protect the wires from contact with small branches or twigs of trees.

Of course, usage and custom do not justify negligence. But we have been cited to no authority, nor have we been able to find any, which holds that power companies must insulate their overhead transmission wires, placed a proper distance above the ground, to guard against possible injuries occasioned by their falling into the streets.

The insulation of such overhead street wires to guard against the reasonable probability of human contact therewith by workmen and others who are required to be near such wires presents a different problem. 29 C. J. S., Electricity, § 44, pp. 589, 590; 18 Am. Jur., Electricity, § 94, pp. 488, 489; *Danville* v. *Thornton*, 110 Va. 541, 66 S. E. 839.

Since the testimony of the expert witnesses for the defendant as to the necessity of the insulation of these wires was uncontradicted and runs counter to no principle of law, it was conclusive of the matter. *Jeffress* v. *Virginia Ry., etc., Co., supra; Virginia Stage Lines* v. *Newcomb, supra.*

Next, the plaintiff insists that the jury might have concluded that the breaking of the wires was occasioned by an undue strain which had been placed on them by a pole near the point of the break which had been in a leaning position for some time prior to the accident. It is argued that the jury might have found that the defendant was negligent in overloading or otherwise causing or permitting the pole to get into an improper position.

The plaintiff undertook to develop this theory on the cross-examination of certain of the defendant's witnesses. How-

ever, these witnesses were firmly of the opinion that there was no causal connection between the leaning of the pole and the breaking of the wires. They pointed out that an inspection of the ends of the broken wires showed that they were burned apart and not broken by strain or traction.

Thus, the evidence in the present record fails to support this contention of the plaintiff.

The plaintiff also argues that the jury might have inferred that the defendant was negligent in failing to employ circuit breakers, which she says in her brief would have automatically turned off the current on the wires at the time of the break.

The record before us is entirely devoid of evidence as to the necessity of employing such appliances or their function, or whether their employment would have avoided the accident.

Nor do we find in the record now before us any support for the contention of the plaintiff that the defendant was negligent in failing to cut off the power after it received knowledge of the break.

The trial court did not pass upon whether the decedent was guilty of contributory negligence, as a matter of law, in attempting to remove the energized wire from the hands and body of Ryan, but since that question may arise at a new trial we shall state the principles upon which it should be determined.

In 38 Am. Jur., Negligence, § 228, pp. 912, 913, the author says:

"The general rule that one who is aware of a danger and fails to exercise ordinary care to avoid injury therefrom is guilty of contributory negligence which precludes him from a recovery against the person whose negligence was responsible for the peril is subject to a limitation where the exposure to danger was for the purpose of rescuing a person from peril. The limitation rests up(on) the principle that it is commendable to save life, and although a person attempting to save it voluntarily exposes himself to danger, the law will not readily impute to him responsibility for an injury received while doing so. The rule is well settled that one who sees a person in imminent and serious peril caused by the negligence of another cannot be charged with contributory negligence, as a matter of law, in risking his own life or serious injury in attempting to effect a rescue, provided the attempt is not recklessly or rashly made. In other words, in attempting to save the life of another, one

is justified in exposing himself to danger in a manner that under other circumstances would deprive him of legal redress for injuries sustained. * * * However, in order to justify one in risking his life or serious injury in rescuing another person from danger, the peril threatening the latter must be imminent and real, and not merely imaginary or speculative. There must be more than a mere suspicion that an accident to some person may follow if a rescue is not performed. Generally speaking, even to save human life, one cannot rashly or recklessly disregard all consideration for his own personal safety without being charged with contributory negligence. * * * "

See also, Restatement of the Law, Torts, Vol. 2, § 472, p. 1241 *ff; Wright* v. *Atlantic Coast Line R. Co.,* 110 Va. 670, 674, 66 S. E. 848, 25 L. R. A. (N. S.) 972, 19 Ann. Cas. 439; *Southern Ry. Co. v. Baptist,* 114 Va. 723, 727, 728, 77 S. E. 477.

As a general rule whether a person is guilty of contributory negligence in rushing into a place of danger to save another from imminent death or injury is a question for the jury. 65 C. J. S., Negligence, § 258, p. 1173; *Southern Ry. Co. v. Baptist, supra.*

These principles have frequently been applied in cases of electric shock. See 18 Am. Jur., Electricity, § 77, p. 474; Annotation: 19 A. L. R. 32; 158 A. L. R. 206.

For these reasons the judgment complained of is reversed and the case remanded for a new trial in accordance with the principles here stated.

*Reversed and remanded.*